WALDO & PENOBSCOT TELEPHONE CO.

*vs.*

CENTRAL MAINE POWER CO.

Kennebec.　　Opinion April 14, 1932.

*Locke, Perkins & Williamson,* for plaintiff.
*Perkins and Weeks,*
*Lewis A. Burleigh, Jr.,* for defendant.

SITTING: PATTANGALL, C. J., DUNN, STURGIS, BARNES, FARRINGTON, THAXTER, JJ.

THAXTER, J.   This case, after a verdict for the plaintiff for $4,908.34, is before us on the defendant's motion for a new trial and on its exception to a ruling of the presiding Justice refusing to order a verdict for the defendant. The motion and the exception raise the same issue, and we shall accordingly consider only the motion.

The plaintiff has paid compensation to an injured employee, and in accordance with the provisions of R. S. 1930, Chap. 55, Sec. 24, seeks to recover for itself the sum so paid, and for the employee any amount beyond that which he may be entitled to receive because of injuries suffered by reason of the defendant's negligence.

The plaintiff telephone company carries on its business in Waldo County. At the time of the accident which gave rise to this litigation it had in the town of Brooks a line which had been built in 1907. Along the same highway on which this was located the defendant in 1916 had constructed a power line, which at the time of the accident carried 33,000 volts of electricity. The high tension power wires were from three to four feet above the wires of the defendant.

On the accompanying plan poles 1, 2 and 3 represent the original location of the telephone line; 779, 780, 781 and 782 the power line. Poles 0, 2 and 3 indicate the position of the telephone line as it was being reconstructed at the time of the accident. As-

suming pole 2 to be in a vertical position, the top bracket on it to which the telephone wires were attached would be from three to four feet under the power line. At this point the telephone wires crossed at an angle under those of the defendant, and here at a distance of approximately three feet the lines of the two companies were nearest each other. So long as the telephone wires remained attached to pole 2 their altitude at the point of the crossing was determined by the brackets on poles 2 and 3, unaffected in any respect by the height of the brackets on either pole 1 or pole 0.

On July 22, 1930, the plaintiff had in its employ James B. Payson, who was working here as a lineman with another man as helper. Poles 2 and 3 had been damaged and were leaning, pole 2 at an angle of about 30 degrees. These were reset and placed back in a vertical position; and the location of pole 1 was then changed by placing it at the point 0. Poles 0, 2 and 3 were then in a straight line. The significant part of this operation appears to be that though the brackets on pole 0 were a foot lower than when it was located a point 1, yet if the wires were pulled taut between poles 0 and 3, they would be about eight feet above pole 2 and about four feet above the wires of the defendant power company.

When the work of resetting the poles had been completed, preparations were made to restring the wires which were lying on the ground. One was apparently fastened to the insulator on pole 3, and then thrown over the bracket on pole 0. A block was fastened to a tree beyond the pole, and, with the aid of a tackle on the ground, the wire resting across the bracket was pulled ahead and thus raised from the ground between poles 0 and 3. It was Payson's purpose to lift the wire as high as the insulator on pole 2; and when he thought that it had reached this point, he fastened his tackle and climbed pole 0 to make his first permanent attachment of it there. While he was attempting to raise it the few inches from the bottom of the bracket to the insulator, the wire became charged with electricity and he received a shock which resulted in the injuries for which this suit is brought. That the electricity came from the wires of the defendant is conceded by both sides. The telephone wire was attached to a house a few hundred feet southerly of pole 3; and the charge of electricity was sufficient to char the side of this house

where the wire entered it and to burn off the telephone wire near pole 2. Mrs. Delbert Ames who lived in the house testified that she heard a crash and saw a large flame near this same pole.

The negligence charged in the plaintiff's declaration is that the defendant placed and maintained its wires too near the telephone line, and that as a consequence the electricity of the defendant jumped across the intervening space and then travelled over the wire of the telephone company to the body of Payson. There is in evidence an order of the Public Utilities Commission, effective May 1, 1928, applicable to the "reconstruction, replacement and maintenance of any of the existing facilities," which provides that there shall be a minimum clearance of six feet between such lines as we are concerned with here.

The defendant maintains that there was no breach of this rule, which was not intended to force the reconstruction of all existing lines not having the minimum clearance. If, however, there was a violation of it, the defendant says that such violation was not the proximate cause of the injuries to Payson, who was himself negligent in raising his telephone wire so that it either came in contact with the power line or within a few inches of it so that an arc formed from one to the other.

The plaintiff's case is based on the assumption that Payson in doing his work did not raise his wire any nearer to the power line than it had always been. The defendant tries to refute this claim by pointing out that the telephone poles were in a leaning position and that the plaintiff in straightening them did bring its wire in closer proximity to the power line. It seems obvious, however, that the poles were not set in the first instance in other than a vertical position, and the evidence substantiates the plaintiff's contention that, after the telephone poles were straightened, the brackets on them were in the same relative position to the power line as they had been originally. The real issue is, therefore, whether the location of the defendant's wires within a distance of from three to four feet of those of the plaintiff was negligence which contributed as a proximate cause to the injury to Payson.

On this point much expert testimony has been given, and as we read the evidence there is no material conflict in fundamentals be-

tween the witnesses for the plaintiff and those for the defense. The plaintiff's thesis seems to be to establish the fact that electricity can jump from one wire to another a distance of from three to four feet through the air. It is not, however, without significance that these lines had remained in these positions for a period of fourteen years under varying atmospheric conditions, through summer heat and winter cold, and no such phenomenon had ever before been recorded as took place while the plaintiff's employee was working there on the afternoon of July 22, 1930, when admittedly the weather conditions were normal in every respect. The plaintiff relies particularly on the testimony of Professor Woodruff of the Massachusetts Institute of Technology, an authority on electric power transmission. He states that electricity may pass through the air from one conductor to another either in the form of a corona or in an arc. The air is a nonconductor but is often broken down in close proximity to wires heavily charged with electricity, and as a result small amounts of current known as a corona escape over this modified air. This discharge may manifest itself to the eye as a glow or to the ear by a hissing sound, and may transfer itself to other wires if they are sufficiently near. A fair interpretation of Professor Woodruff's testimony is that except for unusual conditions not present in this case the amount of current, which would pass by a corona from one wire to another at a distance of three feet, would be so small that harm could not come to one who might be in contact with the wire so charged. It is impossible, therefore, to believe that the injuries suffered by Payson were due merely to the leakage of the small amount of current that manifests itself in the corona. Professor Woodruff, moreover, is emphatic in stating that the burning off of the wires and the scorching of the house to which they were attached could not have been caused by corona. Such powerful force was due to a short circuit caused either by the telephone wire coming in contact with the power line or by its being moved so close to it that an arc formed from one to the other. An arc is different from a corona in that, instead of small amounts of electrical energy dissipating themselves through the air, a large body or the main stream of the current is diverted from one conductor to the other. It seems, however, to be conceded by all of the

experts that an arc will not form if the two conductors are more than four inches apart. On this point Professor Woodruff testified as follows:

"Q. Can you tell us somewhere near in inches what you would expect between wires such as these on a fair day in July, mid-day?

A. I think the actual arc between the wires would not jump more than a very few inches, possibly three or four inches as a maximum."

The plaintiff's counsel practically concedes that an arc must have formed, and as we understand it has two explanations. The first is that Payson actually received in the first instance a shock from a corona discharge, and, by his convulsive movements in trying to disengage himself from the charged wire, waved it and jerked it so that it flew up and came in contact with the power line. This is a theory, a mere conjecture, and there is no evidence in the record to substantiate it. The second contention is that the arc actually formed while the wires were from three to four feet apart. This is claimed in spite of the testimony of his own witness that three or four inches is the maximum distance within which a current of electricity will jump through the air. It is true that he cites to Professor Woodruff a case alleged to have occurred twenty-five years ago, in which electricity is supposed to have formed an arc over a space of five feet. His witness calls attention to several factors that might explain such an occurrence, lightning for example, or the sudden opening of a circuit which might cause an abnormal voltage, and admits the possibility of such an incident. In seeking, however, to account for what happened to Mr. Payson here, we are concerned with probabilities rather than possibilities. From such circumstances as we know to have existed we are to draw reasonable inferences rather than fanciful ones; and we should not give undue weight to an occurrence which, if it took place as alleged, was so unusual as to have been a matter of comment among electrical engineers for a quarter of a century. In our opinion it is impossible to believe that an arc formed between these wires when they were three feet apart. The conditions were normal and why

such an event should only have taken place after fourteen years is inexplicable.

We have here a case of circumstantial evidence, consisting of certain physical facts, a charge of electricity in a supposedly dead wire, a flash, a roar, a scorching of the house to which the wire was attached, the melting of the wire itself, and burns on the body of the man in contact with it. From what we know today of the properties of electricity, these occurrences point to but one conclusion that the wire, which had served as a conductor for that current, had come in contact with another heavily charged wire or had come so close to it that an arc had formed permitting the current to pass from the one to the other. What is there to rebut such a necessary inference? We have merely the testimony of the lineman himself, who states that he raised the wire only as high as the bracket on pole 2, which admittedly was at least three feet under the power line. But he was clearly mistaken and the probative force of his evidence on this point is destroyed by his subsequent testimony on cross-examination. He was being questioned about the height of the telephone wire at pole 2, when the following colloquy took place.

"Q. You were not paying much attention to how near or how far it was from the high tension line?

A. I took it for granted that the high tension line was all right; and it is hard to tell how far wires are apart in the air.

Q. You were not giving any particular attention to how near you were bringing those wires?

A. I could not tell. I did not suppose it was bringing them near enough to do any harm."

Here then is a perfectly frank admission that he did not know how far apart the wires were. The truth of the matter is that the accident was due entirely to his own carelessness. In stringing the wires on the original line between poles 1, 2 and 3, it was essential, because of the angle made by the line at pole 2, that the wires be held in the bracket at that pole before tension was put on them. When pole 1 was shifted to the position 0, the three points then being in a line, this procedure was no longer necessary, for the wire could be pulled from 3 to 0 and subsequently fastened to pole 2.

This course was, however, a dangerous one if special care were not taken to see that the line was not pulled so taut that the wire would rise above pole 2 and strike the high tension line. Payson without knowing the space between the two lines appears to have assumed that the distance was safe, when in fact they must have been nearly in contact. Without making any further observation he climbed pole 0, and, in attempting to raise his wire the few inches necessary to place it in the insulator, either brought it into contact with the power line or within such close proximity to it that an arc formed and his line became charged with electricity.

The conclusion is irresistible that not only has the plaintiff failed to show negligence on the part of the defendant contributing to the accident but that the injuries suffered by Mr. Payson were due to his own want of due care.

Under the circumstances the entry must be,

*Motion sustained.*
*New trial granted.*